```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION


Kimberly Dawn York,          :

       Plaintiff,            :

     v.                      :     Case No. 2:13-cv-0466

Commissioner of Social       :     JUDGE GREGORY L. FROST
   Security,                       Magistrate Judge Kemp
                             :
       Defendant.
```

REPORT AND RECOMMENDATION

I. Introduction

Plaintiff, Kimberly Dawn York, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income.  Those applications were filed on December 30, 2009 and alleged that Plaintiff became disabled on November 11, 2009.

After initial administrative denials of her application, Plaintiff was given a hearing before an Administrative Law Judge on November 15, 2011.  A supplemental hearing was held on December 5, 2011.  In a decision dated January 24, 2012, the ALJ denied benefits.  That became the Commissioner's final decision on March 11, 2013, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on July 19, 2013.  Plaintiff filed her statement of specific errors on August 19, 2013.  The Commissioner filed a response on November 8, 2013.  No reply brief was filed, and the case is now ready to decide.

II. Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 51 years old at the time of the administrative hearing and had completed two years of college,

testified as follows. Her testimony appears at pages 53-70 of the administrative record.

Plaintiff was working at the time of the hearing and had been doing so since February, 2011. She was working 20 to 25 hours per week, which was a function of the company's need and not her ability to work more hours. Her job entailed reserving rides for a public transit system and also doing data entry. She testified to having some issues with memory and accuracy. Before that, and before an accident she testified about, she had been working as a caregiver for an autistic individual.

Plaintiff was injured when she was struck by a car while she was riding her bicycle. She said that afterwards, she developed major issues with her memory and still had some problems with her left shoulder. The shoulder problems limited her ability to reach or lift, especially overhead. She had a job coach to help her transition into her current job, and the coaching lasted between two and three months.

When not working, Plaintiff was taking online classes with the University of Phoenix, and had been doing so for six years. Her grades were acceptable (As and Bs) but her memory had been causing her some problems there as well. At home, Plaintiff did housework but no cooking or laundry. She attended church two or three times per month. Finally, Plaintiff testified to a varied work history involving some heavy jobs and some sedentary ones, and said that she had become very depressed and anxious while recovering from her accident, but that she improved with medication.

### III.  The Medical Records

The medical records in this case are found beginning on page 318 of the administrative record. The pertinent records can be summarized as follows.

Plaintiff was seen at the emergency room of Fairfield

Medical Center on December 26, 2009 after having suffered a hairline fracture of her shoulder while in Michigan. She was discharged in stable condition with medication and told to follow up with her doctor. (Tr. 318-30). She did have some follow-up treatment afterwards, including physical therapy.

Plaintiff saw Dr. Miller, a neuropsychologist, for a consultative examination on June 7, 2010. She reported being homeless for a time and living in a shelter, but was living with relatives at the time of the evaluation. She had been working in a housekeeping position in November, 2009. Plaintiff described problems with her short-term memory, attention span, concentration and vision after the November 11, 2009 bicycle accident. She appeared to be depressed as well and she reported crying spells. Anxiety was also present. Plaintiff was able to go grocery shopping and do laundry. Dr. Miller did not think she had any cognitive limitations in terms of understanding, remembering, and carrying out routine job instructions, but he thought she was mildly impaired in her ability to relate to others and moderately impaired both in her ability to maintain attention and concentration and to deal with work stress. He rated her GAF at 55 (function level) and 60 (symptom level) due to post concussion syndrome, generalized anxiety disorder, and adjustment disorder with depressed mood. (Tr. 356-60). A state agency reviewer, Dr. Hamersma, largely concurred with Dr. Miller's assessment. (Tr. 361-75).

On November 4, 2010, Plaintiff was seen in the Fairfield Medical Center emergency room for a psychiatric evaluation. She reported anxiety and depression as well as suicidal thoughts. After being released, she returned the next day and was then admitted to the hospital for a four-day stay. At that time, she was involved through the Bureau of Vocational Rehabilitation in a job training program. She described memory problems stemming

-3-

from the bicycle accident. She was discharged with a recommendation of follow-up counseling. (Tr. 452-55). During that stay, Plaintiff said she had been experiencing difficulty finding work and that her vocational counselor believed that her anxiety was interfering with that effort and that good psychiatric care would be helpful. (Tr. 492).

On January 19, 2011, a vocational rehabilitation counselor, Pamela Schneider, wrote a letter verifying that Plaintiff was participating in a program called Community Based Work Adjustment and that she would soon move to "job development and placement." Ms. Schneider said that if Plaintiff were placed, she would receive 90 days of coaching, and the plan was to have her working independently by May. (Tr. 471).

The final set of records are counseling notes beginning in late 2010. They show that Plaintiff was still living in a shelter, was bored when she did not have a job, that she obtained work at Lancaster Public Transit on a part-time basis, that she moved into an apartment in May of 2011, and that she had enrolled in an online bachelor's program, was taking math classes, and wanted to obtain a master's degree in real estate. Her mood and anxiety appeared to be under control when she was taking her medications. (Tr. 503-516).

The file also contains some non-medical third-party evidence. On February 7, 2011, a case manager from Lutheran Social Services of Southern Ohio reported that Plaintiff was performing activities of daily living on an independent basis but occasionally became overwhelmed from stress, which caused her to become more easily agitated and less patient. On May 23, 2011, Plaintiff's job coach and a program services coordinator from Functional Training Services, Inc., prepared a report indicating that Plaintiff had gone from 20 hours to 28 hours per week at the Transit Authority, that her employer was hoping to offer her

full-time work in the future, and that she successfully completed her 90-day "Follow-Along."  Earlier reports from the same agency tracked her progress in obtaining and performing the job, noted that since being put on medications in late 2010 her ability to stay on task had improved, and stated that the was "absolutely able to perform all tasks required" in her job as long as she stayed focused and calm.  (Tr. 300-12).

### IV.   The Vocational Testimony

A vocational expert, Ms. McKeever, testified at the first administrative hearing.  Her  testimony begins at page 70 of the record.

Ms. McKeever identified Plaintiff's past work as ranging from light and skilled or semi-skilled to medium or heavy and slightly less skilled.  Some of those skills were transferable. She was then asked some questions about a hypothetical person who could perform medium work but could only occasionally reach overhead with the non-dominant extremity, and who was limited to the performance of simple, routine tasks which did not change throughout the work day and which were not fast-paced in nature or had strict production requirements.  According to Ms. McKeever, someone with those restrictions could not perform Plaintiff's past relevant work but could do jobs such as administration work or packer (using the skills which would transfer), or unskilled jobs such as general cleaner, marker, or warehouser.  If the person were limited to lifting 20 pounds with dominant arm and ten with the restricted one, that would reduce the available jobs by 25%.  Finally, Ms. McKeever testified that skilled or semi-skilled jobs involved more than simple, routine tasks.

At the second administrative hearing, a different vocational expert, Dr. Olsheski, was asked some additional questions about the vocational issues in the case.  He identified Plaintiff's

-5-

past work as ranging from sedentary to medium in exertional level, and it was all either skilled or semi-skilled.  He thought the clerical skills which Plaintiff had acquired would transfer to other clerical jobs.

Dr. Olsheski was asked to answer the same hypothetical question which was first posed to Ms. McKeever; like her, he responded that someone with those limitations could not do any of Plaintiff's past work.  The limitations were, however, consistent with the performance of some medium unskilled jobs such as hand packer or packing and filling machine operator.  In response to the second question asked to Ms. McKeever, involving additional lifting restrictions, Dr. Olsheski testified that such a person could do light, unskilled jobs such as cleaner, production inspector, or light hand packer.  Someone who could not reach either overhead or forward on more than an occasional basis could not do the cleaner job but could perform the other two.  When asked about one additional limitation - only occasional grasping, handling and fingering with the non-dominant hand - Dr. Olsheski said that all of the light unskilled jobs would be ruled out because all of them required the frequent use of both hands.

V.   The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 15 through 32 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured requirements for disability benefits through December 14, 2014.  Next, Plaintiff had not engaged in substantial gainful activity from November 11, 2009 forward.  As far as Plaintiff's impairments are concerned, the ALJ found that Plaintiff had severe impairments including status post-avulsion fracture of the left shoulder, a post concussion syndrome, a generalized anxiety disorder, and an adjustment disorder with

depressed mood. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform less than a full range of light work, could not lift more than ten pounds with her left upper extremity, could not reach overhead with her left arm more than occasionally, and was limited to simple, routine tasks that did not change throughout the workday and tasks that were not subject to strict time requirements or fast-paced in nature. The ALJ found that, with these restrictions, Plaintiff could not perform her past relevant work, but she could perform jobs such as cleaner, inspector, and hand packer, and that such jobs existed in significant numbers in the regional and national economies. Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

VI. Plaintiff's Statement of Specific Errors

In her statement of specific errors, Plaintiff raises a single issue. She argues that the ALJ improperly disregarded the evidence from her rehabilitation program and that his conclusion that she had the same mental capacity on the date of her head injury as on the date she completed that program was "nonsense." The Court generally reviews the administrative decision of a Social Security ALJ under this legal standard:

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402

U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

    After reviewing Plaintiff's argument in depth, it is somewhat difficult to determine exactly what her primary contentions are.  For the most part, she appears to suggest that the ALJ failed to follow Social Security Ruling (SSR) 06-03p by failing to give any consideration or weight to the records of her work rehabilitation efforts with the BVR.  Alternatively, Plaintiff may be arguing that the ALJ's decision as to her residual functional capacity is not supported by substantial evidence because it does not represent a reasonable interpretation of the record as a whole, including the evidence about her BVR rehabilitation efforts.  The Court finds neither of these arguments to be persuasive.

    SSR 06-03p deals with the subject of evidence from sources who are not "acceptable medical sources" in disability cases.

Such sources may include nurse practitioners, chiropractors, social workers, teachers, counselors (including rehabilitation counselors) and lay witnesses like spouses, parents, or siblings. After noting that the regulations relating to acceptable medical sources, including 20 C.F.R. §§404.1527 and 416.927, do not directly address how to evaluate this type of "other evidence," the Ruling states that the factors set forth in those regulations "can be applied to opinion evidence from 'other sources'" and that "the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning."

    The language of this Ruling recognizes that "there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision ...." The case law is clear that only certain social security regulations trigger a duty to articulate, in a specific fashion, both that the ALJ has considered certain evidence and how he or she has weighed it. See, e.g., Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004). Wilson was based on mandatory language found in 20 C.F.R. §404.1527 and in SSR 96-2p, language that is not present in SSR 06-3p, and the Court of Appeals has not, based on the Court's research, implied a similar duty under SSR 06-3p.

    Some courts have suggested, however, that the failure to address opinions rendered by sources which are not "acceptable medical sources" is legal error and may require remand. See, e.g., Watson v. Comm'r of Social Security, 2007 WL 4557859, *7 (W.D. Mich. Dec. 20, 2007); see also Patterson v. Astrue, 2010 WL 2232309, *14 (N.D. Ohio June 2, 2010). Nevertheless, it seems clear that "SSR 06-03p, in contrast to regulations pertaining to the handling of treating source opinions, does not require that

-9-

an adjudicator articulate 'good reasons' for the rejecting of an 'other source's' opinion...." Saucier v. Astrue, 2011 WL 1158256, *5 (D. Me. March 28, 2011), adopted and affirmed 2011 WL 1526952 (D. Me. Apr. 22, 2011).  As this Court has consistently held, "an ALJ is not required to discuss every piece of evidence in the record." Miller v. Astrue, 2010 WL 1644028, *4 (S.D. Ohio March 23, 2010), adopted and affirmed 2010 WL 1644026 (S.D. Ohio Apr. 23, 2010).  See also Thacker v. Comm'r of Social Security, 99 Fed. Appx. 661 (6th Cir. May 21, 2004)(finding no "articulation duty" in SSR 96-7p but only a duty to consider Social Security employees' observations of a claimant). Consequently, the question here is whether the record supports Plaintiff's claim that the ALJ completely ignored the records relating to her rehabilitation process.

 As the Commissioner points out, the ALJ's decision contains a number of explicit references to the BVR materials.  It is clear from even a casual reading of the ALJ's decision that the ALJ was fully aware of the Plaintiff's current work situation, the fact that she had used the services of a job coach, and the fact that her job had been obtained through the BVR.  One note from her BVR counselor was cited explicitly in the decision, see Tr. 26, and facts relating to the BVR process are sprinkled throughout.  It is also apparent that the ALJ did not ignore the exhibits in the "E" section of the record, where the notes from Functional Training Services are found; the administrative decision contains a number of specific references to exhibits in that section of the record, although not necessarily that precise exhibit.  There is enough in the administrative decision to persuade the Court that the ALJ did consider the BVR records as required by SSR 06-03p.

 Assuming, without deciding, that the ALJ also had a duty to provide some explanation for how those records were considered, it is important to note that none of those records contained any

explicit statement that Plaintiff was unable to work.  In fact, they show that she had the ability to work based on her past experience and the progress she had made in the initial stages of the BVR program.  As early as January, 2011, when Plaintiff had been working for only a few weeks, she was described as "absolutely" being able to perform the duties of her job.  (Tr. 309).  Before she was placed in employment, she had demonstrated the ability to do "tasks with excellent quality most of the time."  (Tr. 311).  Her issues appeared to be centered around planning and organizing her work and maintaining attention, but there is no indication that these problems were so serious as to preclude her from finding and keeping a job - just the opposite, because she completed the initial program successfully and moved on to job placement.  All of that occurred within a month to six weeks after her November, 2010 psychiatric hospitalization.

The ALJ, understandably, focused his attention on the medical evidence related to Plaintiff's mental capacity to do work-related activities.  Plaintiff does not argue that those evaluations do not support the ALJ's decision; in fact, the ALJ explicitly adopted the findings of Dr. Miller, who performed the only consultative mental status examination, and who found, in June, 2010, that Plaintiff had only a moderate impairment in a few work-related areas.  Although Plaintiff argues that this finding "did not answer the specific question of whether her capacity was sufficient to perform competitive work activity," Statement of Errors, at 14, the ALJ accommodated this limitation by restricting Plaintiff to the performance of jobs in a low-stress environment which did not involve more that simple, routine tasks and without significant changes in the workplace. Plaintiff makes no argument that this assessment is inconsistent with either Dr. Miller's opinion or that of the state agency reviewers.  The ALJ discussed at considerable length the evidence concerning the severity of Plaintiff's head trauma and the degree

-11-

to which her depression and anxiety might have interfered with her ability to work. The Court has no difficulty following the ALJ's reasoning process, and a further articulation of how the BVR records were factored into that process is not needed in order to allow for meaningful review of the ALJ's decision.

This discussion also answers the second question posed by Plaintiff's Statement of Errors. The evidence, taken as a whole, would permit a reasonable person to conclude that Plaintiff was not, for any 12-month period, unable to work at jobs within her functional capacity. It is important to note that the BVR records not only do not state that she was unemployable when she began the program, but they do not address at all the question of whether she could do the types of unskilled jobs identified by Dr. Olsheski. Those jobs, according to the record, could be performed by someone with Plaintiff's psychological restrictions as they were evaluated by the mental health professionals throughout the time period in question. The job she obtained through BVR, which fell just short of the earnings needed to qualify it as substantial gainful activity, appears to require a greater level of functioning, particularly in the area of changes in the workplace setting. Further, as the ALJ noted, during this entire period of time, Plaintiff was successfully completing online college courses. Neither the BVR notes, nor the remainder of the evidence, conflicts with the ALJ's decision; even if there were some conflict, the ALJ reasonably resolved any conflicts based upon sufficient evidence, which is all that is required under the "substantial evidence" standard of review. See, e.g., Bartyzel v. Commissioner of Social Security, 74 Fed.Appx. 515, 523 (6th Cir. Aug. 26, 2003)("where the Commissioner's decision is supported by substantial evidence, it must be upheld even if the record might support a contrary conclusion"), citing Smith v. Sec. of Health & Human Services, 893 F.2d 106, 108 (6th Cir. 1989). Further, given the entirety of the record, any failure to

discuss in more detail the BVR records is harmless error, as it would not likely have altered the results of the ALJ's final decision.  Cf. Bowen v. Comm'r of Social Security, 478 F.3d 742, 746 (6th Cir. 2007)(ALJ's decision, when supported by substantial evidence, may be upheld even if error occurred unless "that error prejudices a claimant on the merits or deprives the claimant of a substantial right").  That is not the case here, and Plaintiff's argument does not support reversal or remand.

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors be overruled and that judgment be entered in favor of the defendant Commissioner of Social Security.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d

947 (6th Cir. 1981).

                                                      /s/ Terence P. Kemp
                                                      United States Magistrate Judge